SEALED

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN THE MATTER OF            )
THE EXTRADITION OF          )     CASE NO. 6:22-mj-2127
IAN WILLIAM DEAVALL         )
_____)

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligations to the Government of the United Kingdom of Britain and Northern Ireland (collectively, the "United Kingdom").

2. There is an extradition treaty in force between the United States and the United Kingdom (the "Treaty").[1]

3. Pursuant to the Treaty, the Government of the United Kingdom has submitted a formal request through diplomatic channels for the extradition of IAN WILLIAM DEAVALL ("DEAVALL"), who is wanted for prosecution.

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC NO. 108-23 (2004) (the "2003 Treaty"), and related Exchanges of Letters, *as amended by* the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

1

4. According to the information provided by the Government of the United Kingdom, the Crown Prosecution Service authorized charging DEAVALL with two (2) counts of rape, contrary to section 1 of the Sexual Offences Act of 1956 ("Sexual Offences Act"), nine (9) counts of indecent assault, contrary to section 14 of the Sexual Offences Act, and five (5) counts of causing gross indecency with a child, contrary to section 1 of the Indecency with Children Act of 1960.

5. The offenses were committed within the jurisdiction of the United Kingdom, in Northern Ireland. The charges against DEAVALL were laid before the Manchester and Salford Magistrates' Court. On September 25, 2020, an arrest warrant for DEAVALL regarding the authorized charges was issued by District Judge Bernard Begley at Manchester City, United Kingdom. Upon the issuance of the arrest warrant, no other charging document was required under United Kingdom law. The arrest warrant issued in the United Kingdom remains valid and enforceable.

6. The United Kingdom's extradition request presents the following information as the basis for the arrest warrant:

    a. F.R., the victim, was born in September 1970. On March 22, 2019, and April 29, 2019, F.R. provided evidence to United Kingdom law enforcement by written and video recorded statements reporting that in the first half of 1983, while F.R. was twelve years old, DEAVALL, who was involved in an extra-marital intimate relationship with her mother, P.B., repeatedly

sexually assaulted her, including two instances where DEAVALL vaginally raped her.

b.  F.R. told law enforcement she was able to be precise on the dates because she was auditioning for the Northern Ballet School at the time.

c.  F.R. told police she first met DEAVALL while visiting the Moben Kitchen store where her mother worked. F.R. reported that DEAVALL would come to her home, where she lived with her parents and sisters, in the evening after F.R.'s father went to work on the nightshift in a factory. F.R. subsequently discovered DEAVALL and her mother were involved in an intimate relationship.

d.  DEAVALL would go to the first-floor bathroom and then tell P.B. he was "tucking [F.R.] in" to bed. On the first two occasions DEAVALL came to the house, he entered her bedroom, stroked her hair and face, and told her she was beautiful. F.R. said:

> And then, on maybe the third occasion, he would put his hand under the blankets and play with my vagina. And he would grab my hand and put it inside the crotch of his trousers to make me feel his penis . . . I now know it, it's an, an erection. And he used to do this till he ejaculated. This went on for a month or so, maybe six weeks or longer.

e.  F.R. reported that occasionally DEAVALL would touch her breast area, which was budding and not fully developed. F.R. said the assaults while she was in the bed always occurred in the same way, and that they continued over a six-month period.

3

f. F.R. described two occasions when DEAVALL came to the house while her parents were out and took her for a ride in a car. F.R. reported that DEAVALL used multiple cars, one black and one dark silver, to which he had access through his job. F.R. told law enforcement:

> [O]n this one occasion, my mum and dad had gone to parents' evening and he came to the house to get me, and he said we were going for a ride in his car. And I got into his car and he took me for a ride to somewhere that I didn't know, and it was dark. So, he then made me take one leg out of my trousers and . . . or I'd . . . On another occasion I had a skirt on. But he make [sic] me take one leg out of my trousers and take my knickers off. And he would pull his trousers down. And he would play with me, he'd make me play with him. He made me perform oral sex on him and I didn't like it and I was gagging. And he made me do it more. And, and then he grabbed me, and he pulled me on top of him, and he pushed his penis inside me. And this happened on more than one occasion. I don't know what else to say.

g. On both occasions, DEAVALL digitally penetrated F.R. and made her perform oral sex on him by pushing his penis into her mouth. On the first occasion DEAVALL pulled her on top of him in the car and penetrated her slightly as F.R. was sobbing hysterically in distress. On the second occasion, the same sequence of events occurred, this time ending in DEAVALL fully penetrating F.R.'s vagina with his penis. The second assault caused substantial bleeding that lasted a week.

h. None of the sexual assaults or penetrations were committed with F.R.'s consent. F.R. reported to law enforcement that she told him to stop on each occasion DEAVALL assaulted her:

4

I'd be saying, "I don't want to. I don't want to. I, I, I want my mum." Er, "I want this to stop." And he just kept saying, "It's because you're special," and, "[i]f you tell anybody, your parents will get divorced and it'll all be your fault[."] . . . And I believed it, I believed every word that he said to me, I believed that my parents would get divorced if he, if he, erm . . . [i]f I told anybody.

i.   F.R. reported that DEAVALL's sexual assaults had a severe negative impact on her, causing her to self-harm, deny herself food, and change her appearance. For example, she cut off her long hair "to make myself look different" because "he told me I was so beautiful and that I had beautiful hair . . . and I didn't want to be beautiful anymore."

j.   On April 20, 2019, P.B. provided a statement to United Kingdom law enforcement. P.B. confirmed that she had a relationship with DEAVALL at the time of the alleged assaults, and that DEAVALL came to her home after her husband had left for work at 9:00 p.m. P.B. confirmed that F.R. first met DEAVALL at the Moben Kitchen store and that DEAVALL drove a black sports car. P.B. further told police that around the time of the alleged assaults, F.R., whom P.B. described as a "lovely child," suddenly became "introvert[ed] and moody," chopped off her blonde hair, and dyed her hair blue or green.

k.   M.L, F.R.'s younger sister, provided a statement to United Kingdom law enforcement on March 5, 2020. M.L. told police that in 1997 she had a conversation with F.R. about being "touched" by a man who worked with her mother at the Moben Kitchen store.

6. T.R., F.R.'s husband, provided a statement to United Kingdom authorities on June 4, 2020. T.R. told police that in approximately October 2004, after he and F.R. had been dating for a few months, F.R. disclosed to him that when she was a child she was sexually abused by one of her mother's boyfriends (or someone her mother had an extra-marital affair with). T.R. said F.R. did not disclose the person's name or specifics about what occurred, but she was very distressed when she spoke. T.R. said many years later, in 2019, F.R. was ready to speak about the assaults and contacted the authorities.

7. P.B. viewed an identification photograph of DEAVALL submitted by the United Kingdom in support of its request for extradition. P.B. identified DEAVALL from the photograph as the person with whom she had an intimate relationship and worked with in 1982–1983.

8. DEAVALL may be found within the jurisdiction of this Court as the U.S. Marshal's Service has collected information indicating that he is currently residing in Lake Mary, Florida. He has been residing at his current address since January 2021. DEAVALL received a traffic citation in Seminole County in April of 2022. DEAVALL has also been observed at his Lake Mary address.

9. Stacy Hauf, an attorney in the Office of the Legal Adviser of the United States Department of State, has provided the Department of Justice with a declaration authenticating copies of the diplomatic note by which the request for extradition was made along with a supplement transmitted under cover of letter to the Department of Justice, and a copy of the operative Instrument and Annex to the Treaty, stating that

the offenses for which extradition is demanded are covered by the Treaty, and confirming that the documents supporting the request for extradition are properly certified under Article 9 of the Annex so as to enable them to be received in evidence.

10. The declaration from the Department of State with its attachments, including a copy of the diplomatic note from the United Kingdom and supplemental letter, a copy of the operative Instrument and Annex, and the certified documents submitted in support of the request (marked collectively as Government's Exhibit 1) are filed with this complaint and incorporated by reference herein.

11. DEAVALL would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, I respectfully request a warrant for the arrest of DEAVALL in accordance with 18 U.S.C. § 3184 and the Extradition Treaty between the United States and the United Kingdom, and that this complaint and the arrest warrant be

placed under the seal of the court, except as disclosure is needed in furtherance of the United Kingdom's request for extradition, until such time as the warrant is executed.

Respectfully submitted,

*Sarah Megan Testerman*
Sarah Megan Testerman
Assistant United States Attorney

Affidavit submitted by email and
attested to me as true and accurate via
Zoom/video conferencing consistent
with Fed. R. Crim. P. 4.1 and 41(d)(3),
this 2 day of November, 2022.

THE HONORABLE EMBRY J. KIDD
United States Magistrate Judge

8